IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**DEAMONTAE MANNING,**            CASE NO. 3:24 CV 770

    Plaintiff,

    v.                                        JUDGE JAMES R. KNEPP II

**CORRECTION OFFICER KORY
PETINIOT, JR., et al.,**

                                              **MEMORANDUM OPINION AND**
    Defendants.                                  **ORDER**

## INTRODUCTION

Currently pending before the Court in this § 1983 civil rights action alleging a use of excessive force are Plaintiff DeAmontae Manning and Defendants Correctional Officers Kory Petiniot, Jr. and Coby Sparks's cross-motions for summary judgment. (Docs. 33, 35). Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons set forth below, the Court grants Defendants' motion and denies Plaintiff's motion.

## BACKGROUND

At all times relevant, Plaintiff was an inmate at the Ohio Department of Rehabilitation and Correction ("ODRC") Toledo Correctional Facility ("ToCI"). At issue in the present case is a use of force by Defendants ToCI Correctional Officers Kory Petiniot, Jr. and Coby Sparks on December 10, 2022.

In his Verified Complaint,[1] Plaintiff asserts Defendants

---

1. Because Plaintiff's Complaint is verified, *see* Doc. 1, at 11, it can serve as an Affidavit for purposes of summary judgment. *El Bel v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).

> intentionally and [d]eliberately maliciously and sadistically pulled and yanked [his] hand and arm out of [his] tiny port hatch, ben[t] [his] wrist[, and] then used the me[t]al tray port hatch to smash [his] hand until [he] began to bleed and continued after [he] yelled of [sic] the assault, which is cruel and unusual punishment.

(Doc. 1, at 4-5). The incident was, in part, captured on video from body cameras worn by Defendants and a wall-mounted security camera. *See* Defendant's Exhibits A, B, C.[2]

Correctional Officers Petiniot and Sparks were working together "passing breakfast trays" in Plaintiff's unit. (Doc. 1, at 12); (Petiniot Aff., Doc. 35-2, at ¶¶ 3-4); (Sparks Aff., Doc. 35-3, at ¶¶ 3-4). The wall-mounted camera shows officers passing out meals. *See* Ex. A, at 06:32-06:36.[3] The body camera video shows Sparks approaches Plaintiff's cell first. (Ex. C, at 0:06-:11).

"Meal loaf" consists of blended food baked into a loaf and is served without a hard tray (typically paper or Styrofoam); it is a disciplinary meal served to inmates who have misused standard food trays, utensils, or food. (Petiniot Aff., Doc. 35-2, at ¶ 5); (Sparks Aff., Doc. 35-3, at ¶ 5). The standard procedure for delivering a meal loaf "is to open the cuff port, place the food on the inner flap, and allow the inmate to retrieve it before securing the cuff port." (Petiniot Aff., Doc. 35-2, at ¶ 6).

---

2. Exhibit A is the video from a wall-mounted security camera, Exhibit B is the video from Petiniot's body worn camera, and Exhibit C is the video from Sparks's body worn camera (Derek Burkhart Aff., Doc. 35-6, at ¶¶ 7-9).
3. In his Motion for Summary Judgment, Plaintiff asserts – without supporting evidence – that Defendants "destroyed the wall camera footage, deleting portions of the footage throughout the footage causing the footage to show no incident in all." (Doc. 33, at 2). Although it is true that the wall camera footage does not clearly depict the incident, due to the distance the camera is from Plaintiff's cell and the angle of the camera in relation to the food cart, the Court finds Plaintiff has submitted no evidence to support his claim that any footage was destroyed or altered. And Defendants have submitted affirmative evidence stating the video is an "unaltered copy of fixed wall camera video footage[.]" (Burkhart Aff., Doc. 35-6, at ¶ 7).

Video depicts Petiniot approaching Plaintiff's cell with what appears to be a Styrofoam container. (Ex. C, at 0:08-:09); *see also* Doc. 1, at 12 (stating Petiniot "attempted to give [Plaintiff] a meal loaf meal.").

Plaintiff asks why he is receiving the Styrofoam container and Petiniot responds, "Because you're on meal loaf, like I said you was." (Ex. C, at 0:13-:15). Plaintiff asserts in his Complaint that Petiniot was smiling when he said this. (Doc. 1, at 12). Plaintiff states he then said "give me my meal", and attempted to grab the meal loaf. *Id.* In the video, Plaintiff can be heard saying something like "I want it." (Ex. B, at 0:10-:11).

Plaintiff avers Petiniot then threw the meal loaf through the port hatch while Sparks began "pulling" Plaintiff's hand and arm. (Doc. 1, at 12). Petiniot "participated and began yanking" his hand and arm, and bent his wrist. *Id.* Sparks then "smashed" Plaintiff's hand and arm with the metal tray port hatch. *Id.* Plaintiff "began yelling in pain" and the officers continued until Plaintiff began to bleed and his hand and arm began to swell. *Id.* Petiniot avers that when Sparks attempted to deliver Plaintiff the meal, Plaintiff "aggressively thrust both of his hands out of the cuff port toward" Sparks. (Petiniot Aff., Doc. 35-2, at ¶ 7). Petiniot then says he "used [his] hands" to block Plaintiff's hands "from extending any further toward us" while Sparks "attempted to secure the cuff port." *Id.* at ¶ 8. Petiniot further attests that "[t]here is no legitimate reason for an inmate to extend both arms through the cuff port in this manner." *Id.* at ¶ 10. Sparks offers a similar version of events, stating that Plaintiff "abruptly and forcefully extended both arms toward the cuff port . . . in an aggressive manner" and Petiniot responded "by physically blocking [Plaintiff's] hands to help ensure the cuff port could be secured." (Sparks Aff., Doc. 35-3, at ¶¶ 6, 8).

3

On the video, Plaintiff can be heard repeatedly (at least five times) stating "I want a white shirt!", referencing a supervisor. (Ex. C, at 0:22-:32); *see also* Doc. 1, at 12 ("I requested a unit supervisor in a non-aggressive manner."). Plaintiff can subsequently be heard on the video yelling and repeatedly saying, "you're assaulting me!" (Ex. C, at 0:32-:47).

The cuff port and Petiniot's hands are not visible in the video footage while Petiniot is at the cell door, but video reflects Petiniot remains at the cell door/cuff port for approximately 20 seconds. (Ex. C, at 0:21-:39). Sparks is at the cell door/cuff port after the meal loaf is passed for a total of approximately 40 seconds. (Ex. B, at 0:20-1:09); (Ex. C, at 0:21-1:11). Petiniot's body camera video shows Sparks seemingly holding the cuff port closed on Plaintiff's hands with his thigh. (Ex. B, at 0:44-1:09). Both of Plaintiff's hands are visible in the cuff port. *See id.*

Plaintiff said to Petiniot, "you put your hands on me." (Ex. C, at 0:51-:52). Petiniot responds, "yeah, I thought you were grabbing me." *Id.* at 0:52-:54. During this time, he also again says "I want a white shirt!" or "call a white shirt!" *Id.* at 0:42-43; 0:54-56. Petiniot says "I'm not calling the white shirt." *Id.* at 0:56-57.

Plaintiff asserts the officers then "walked away while smiling." (Doc. 1, at 12).

Plaintiff had a history of disciplinary infractions for assaulting others (inmates and officers) with bodily fluids. *See* Doc. 35-4 (conduct reports from September 2021, February 2022, and November 2022, involving feces, saliva, and unknown liquids). Petiniot and Sparks were aware of this history at the time of the incident at issue in the present case. (Petiniot Aff., Doc. 35-2, at ¶¶ 9, 13); (Sparks Aff., Doc. 35-3, at ¶ 7). Both officers aver that based on their training and experience, inmates often keep their arms in the cuff port to prevent it from being closed in order to grab officers or attack them with bodily fluids. (Petiniot Aff., Doc. 35-2, at ¶ 12); (Sparks Aff., Doc. 35-3, at ¶ 9). Petiniot also states that he was aware that Plaintiff "has

4

used this tactic in the past" and that is why he "took immediate steps to block his hands and prevent a possible assault." (Petiniot Aff., Doc. 35-2, at ¶ 13)

Ten minutes after the incident, Plaintiff was seen by a nurse who "cleaned [his] gashes on [his] hand and arm." (Doc. 1, at 9); *see also id.* at 13-14 ("I had open gashes on my right hand and arm and my hand and arm was swollen."). The medical records indicate Plaintiff's right lower forearm had a "small abrasion" and "small amount of swelling", as well as a "small superficial cut without bleeding", and a small red mark (but no bleeding) on the right middle fingernail. (Doc. 35-5, at 6). Plaintiff had full range of motion in his right wrist, hand, and arm. *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257; *see also* Fed. R.

Civ. P. 56(c)(1). Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine dispute of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

A genuine issue of material fact generally does not exist where the record could not "lead a rational trier of fact to find for the non-moving party[.]'" *Matsushita Elec. Indus. Co*, 475 U.S. at 587. This is true even when opposing parties allege two different sets of facts but one is "blatantly contradicted by the record, so that no reasonable jury could believe it[.]" *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, the court must view any facts that are not blatantly contradicted by the record in the light most favorable to the non-moving party. *Coble v. City of White House*, 634 F.3d 865, 870 (6th Cir. 2011).

## DISCUSSION

Defendants move for summary judgment asserting: (1) any official capacity claim against them is barred by the Eleventh Amendment; and (2) Plaintiff cannot establish either the objective or subjective component of his Eighth Amendment excessive force claim. *See* Doc. 35 at 7-9. Defendants further assert they are entitled to qualified immunity because Plaintiff has not demonstrated that either violated a clearly established constitutional right. *See id.* at 10-11. For the reasons discussed below, the Court finds both Defendants are entitled to summary judgment and qualified immunity because Plaintiff has not established a constitutional violation and alternatively because Plaintiff has not demonstrated a clearly established constitutional violation.

Official Capacity Claim

Defendants first contend that to the extent Plaintiff brings a claim against them in their official capacities, such a claim is barred by the Eleventh Amendment. (Doc. 35, at 6). Plaintiff does not respond to this argument. *See* Doc. 37.

Plaintiff's Complaint indicates that Defendants are sued in their individual capacities. (Doc. 1, at 2, 7). Thus, it does not appear he brings an official capacity claim. Nevertheless, Defendants are correct that they are immune from any official capacity damages claims. A suit against a state official operates as an action against the State itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). The State of Ohio has not waived its sovereign immunity, nor has it consented to civil rights suits in federal court. *Mixon v. Ohio*, 193 F.3d 389, 397 (6th Cir. 1999). Thus, any official capacity claims are barred by sovereign immunity. *WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 513-14 (6th Cir. 2021).[4]

Individual Capacity Claim

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating

---

4. Defendants cite Eleventh Amendment immunity rather than sovereign immunity. The Sixth Circuit has explained that although "courts have often treated Eleventh Amendment immunity and sovereign immunity as interchangeable. . . as a matter of original meaning, the two are conceptually distinct." *WCI, Inc.*, 18 F.4th at 513. It distinguished immunity under the Eleventh Amendment as sounding in subject-matter jurisdiction and containing a diversity requirement from sovereign immunity which "refers to a state's right 'not to be amenable to the suit of an individual without its consent' ", sounds in personal jurisdiction, and does not require diversity. *Id.* at 514 (citing The Federalist No. 81, at 486 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (emphasis omitted)). Here, Plaintiff is housed in an Ohio prison and sues Ohio prison officials. Therefore "[b]ecause the parties are not diverse, sovereign immunity applies, and the Eleventh Amendment, by its plain terms, does not." *Id.*

federal rights elsewhere conferred[.]" *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Plaintiff brings his claim under the Eighth Amendment.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Supreme Court has long held that the Fourteenth Amendment incorporates the Eighth Amendment's ban on "cruel and unusual punishments" against the States. *See Robinson v. California*, 370 U.S. 660, 666-67 (1962). The Court has also long held that this ban does not just cover the formal "punishment" that a state court metes out to criminal defendants. The ban also applies to informal harms that prison officials inflict on convicted prisoners during their terms of incarceration. The Eighth Amendment thus regulates, *inter alia*, the force that prison guards use on prisoners. *See Whitley v. Albers*, 475 U.S. 312, 320 (1986). The ban on cruel and unusual punishments prohibits the "unnecessary and wanton infliction of pain" on prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley*, 475 U.S. at 319); *see also Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

The "unnecessary and wanton infliction of pain" requirement "has objective and subjective components, both of which follow from the Eighth Amendment's text." *Johnson v. Sootsman*, 79 F.4th 608, 615 (6th Cir. 2023).

> Objectively, harm to a prisoner must rise to a sufficiently serious level because the Eighth Amendment prohibits only "cruel and unusual" deprivations, not just uncomfortable or "even harsh" ones. *Rhodes*, 452 U.S. at 347, 101 S.Ct. 2392; *see Phillips*, 14 F.4th at 534. Subjectively, harm to a prisoner must result from a prison official's sufficiently volitional actions because the Eighth Amendment bars only willful conduct that "inflict[s]" "punishment," not accidental conduct that causes injury. *See Phillips*, 14 F.4th at 535 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)).

*Id.*

"As a subjective matter . . . prisoners who challenge a correctional officer's use of force must prove more than that the officer acted with 'deliberate indifference' to whether the force was necessary (the type of intent that prisoners must prove to challenge their conditions of confinement or medical care)." *Id.* at 616 (citing *Hudson*, 503 U.S. at 5-6). "The Court has instead described the 'core judicial inquiry' in this use-of-force context as distinguishing between force used in a 'good-faith effort to maintain or restore discipline' and force used 'maliciously and sadistically to cause harm.'" *Id.* (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)); *see also Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992) ("[I]n the prison context, good faith use of physical force may be necessary to maintain prison security and discipline[.]"). "Only the latter kind of force—force exerted maliciously and sadistically to inflict pain—violates the Eighth Amendment." *Johnson*, 79 F.4th at 616. "So even if an officer uses force because of an 'unreasonable' belief that it is necessary to restrain a prisoner, the officer does not violate the Eighth Amendment." *Id.* (quoting *Whitley*, 475 U.S. at 324). The Eighth Amendment "necessarily excludes from constitutional recognition *de minimis* uses of physical force" so long as the use of force is not the type of force that would be "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327). "The negligent use of force—even the reckless use of force—does not establish an Eighth Amendment claim; [Plaintiff] must prove the malicious use of force for the exclusive purpose to inflict pain." *Johnson*, 79 F.4th at 621.

> To decide whether a jury could find that an officer acted with this malicious intent, the Supreme Court has identified several factors to consider: What was the extent of the prisoner's injury? What was the nature of the threat that justified the use of force? Was the amount of force proportional to the threat? And did the officer take any actions designed to reduce the required amount of force?

9

*Id.* at 618. Courts also approach such claims with deference to avoid "unreasonable *post hoc* judicial second-guessing" of officers' conduct. *Lockett v. Suardini*, 526 F.3d 866, 875 (6th Cir. 2008); *see also Johnson*, 79 F.4th at 618 ("[W]hile judges may review an encounter by slowing down, pausing, and replaying a video, officers have no such luxury. They must make quick decisions in the heat of the moment.").

On review of the evidence presented in accordance with the above guidance, the Court finds Plaintiff has not to established a genuine issue of material fact regarding the subjective component of his Eighth Amendment excessive force claim.

First, "although the Eighth Amendment does not require a prisoner to suffer a 'serious injury,' the 'absence' of such an injury goes a long way to disprove any claim that an officer used force with the required intent to harm." *Johnson*, 79 F.4th at 618-19 (quoting *Hudson*, 503 U.S. at 7-8). The Sixth Circuit has denied a prisoner's Eighth Amendment claim when an officer's use of force caused the prisoner minimal injuries such as "only some tenderness, bruising, and slight swelling[,]" *Bullocks v. Hale*, 2021 WL 1578198, at *2 (6th Cir.), or "minor lacerations and cuts," *Lockett*, 526 F.3d at 876. *See Richmond v. Settles*, 450 F. App'x 448, 453–54 (6th Cir. 2011). Plaintiff's evidence shows, at most, that he suffered "minor injuries[.]" *Lockett*, 526 F.3d at 876; *see* Doc. 1, at 9, 13-14; Doc. 35-5, at 6.

Second, Defendants had a "plausible basis" to believe Plaintiff presented a threat at the time of the use of force. *Whitley*, 475 U.S. at 323. Even taking the facts in the light most favorable to Plaintiff, as the Court must at this stage, Plaintiff admits he "attempted to grab the meal loaf[.]" (Doc. 1, at 8, 12). Plaintiff had a past history of assaulting others with bodily fluids and both officers aver that they perceived Plaintiff's actions as consistent with tactics used by prisoners to prevent the cuff port from being closed and that Plaintiff had used this tactic in the

past. *See* Petiniot Aff., Doc. 35-2, at ¶¶ 9, 12-13; (Sparks Aff., Doc. 35-3, at ¶¶ 7, 9). The video depicts that both of Plaintiff's hands were through the cuff port. (Ex. B, at 0:44-1:06). And Petiniot told Plaintiff at the time that he reacted because he thought Plaintiff was trying to grab him. (Ex. C, at 0:52-:54).[5]

Although Plaintiff asserts in his opposition brief that he "was not attempting to harm Defendants" (Doc. 37, at 1), it is not Plaintiff's subjective intent that matters, but how it would be perceived by a reasonable officer in Defendants' position. *See, e.g.*, *Rudlaff v. Gillespie*, 791 F.3d 638, 642 (6th Cir. 2015) ("His purported subjective intent to comply with the officers' requests fares no better, for we view his actions *objectively*, from the perspective of a reasonable officer at the scene."); *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 350 (6th Cir. 2007) ("[T]he subjective intent of the [individual]—unavailable to the officers who must make a split-second judgment—is irrelevant to the question whether his actions gave rise to a reasonable perception of danger.") (Boggs, J., concurring). Further, even if, "in retrospect," a jury found "unreasonable" Defendants' belief that Plaintiff actions presented a threat, the totality of the circumstances on the evidence presented would not permit a reasonable jury to draw the more demanding inference that either Defendant used force for no other reason than to inflict pain or injure him. *Whitley*, 475 U.S. at 319, 324.

Third, there is nothing to suggest that the force used was disproportionate to the perceived threat. *See Lockett*, 526 F.3d at 876. And fourth and finally, Defendants' use of force was brief. Petiniot was at the cell door and thus could have had contact with Plaintiff for at most

---

5. In his opposition brief, Plaintiff disputes that Petiniot said this. (Doc. 37, at 1) ("Defendants made another false statement . . . stating Petiniot told Plaintiff he thought Plaintiff was attempting to grab him through the cuff port, which is false[.] Petiniot not once stated that to Plaintiff[.]"). But the video demonstrates Petiniot said, "Yeah, I thought you were grabbing me." (Ex. C, at 0:51-:52).

11

20 seconds and Sparks for approximately 50 seconds. *See* Ex. C, at 0:21-1:11; Ex. B, at 0:20-1:09.

Although Plaintiff asserts Defendants used force "maliciously and sadistically" (Doc. 1, at 5), such an allegation is simply a legal conclusion. Again, "[t]he negligent use of force—even the reckless use of force—does not establish an Eighth Amendment claim; [Plaintiff] must prove the malicious use of force for the exclusive purpose to inflict pain." *Johnson*, 79 F.4th at 621. Ultimately, taking all of the facts as set forth above, Plaintiff has not demonstrated a question of fact regarding whether Defendants used the sort of physical force "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 7. As such, the Court finds Defendants are entitled to summary judgment.

<u>Qualified Immunity</u>

Even if Plaintiff could establish a constitutional violation, Defendants assert they are entitled to qualified immunity because Plaintiff has not shown the right asserted was clearly established at the time of the alleged violation. (Doc. 35, at 10-11). Specifically, Defendants assert that Plaintiff "cannot identify any precedent clearly establishing that attempting to close a cuff port when an inmate aggressively sticks their hands through it, resulting in only superficial injuries, is unconstitutional." *Id.* at 11. Plaintiff does not respond to this argument. *See* Doc. 37.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v.*

12

*Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity is an affirmative defense; once a defendant raises it, the burden shifts to the plaintiff to demonstrate: (1) the defendant's acts violated a constitutional right, and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). A "clearly established right", for the purpose of determining whether a public official is entitled to qualified immunity, "is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "A defendant bears the initial burden of putting forth facts that suggest that he was acting within the scope of his discretionary authority." *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 568 (6th Cir. 2013). Once a defendant has done so, "[t]he burden of convincing a court that the law was clearly established rests squarely with the plaintiff." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) (citation and internal quotation omitted).

As to the second prong of the qualified immunity analysis, "[f]or a right to be clearly established, 'existing *precedent* must have placed the statutory or constitutional question beyond debate.'" *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022) (emphasis in original) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)). Put differently, "[f]or qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Key*, 179 F.3d at 1000 (citation omitted). "The plaintiff bears the burden of showing that the right was clearly established" and, to meet such a burden, "must provide on-point caselaw that would bind a panel of [the Sixth Circuit]." *Bell*, 37 F.4th at 367-68; *see also, e.g.*, *Campbell v. Hines*, 2013 WL

13

7899224, at *4 (6th Cir.) ("[T]he district court properly declined to address the merits of Campbell's equal protection claim, because he failed to respond to the defendants' argument that they were entitled to qualified immunity.").

Plaintiff has failed to cite any published case (or any case law) that says Defendants' use of force applied to the facts at issue here – an inmate reaching through the cuff port – was unconstitutional. Therefore, he has not met his burden, and for this alternative and additional reason, Defendants are entitled to qualified immunity and summary judgment on Plaintiff's claim.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 33) be, and the same hereby is, DENIED, and it is

FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. 35), be and the same hereby is, GRANTED; and the Court

FURTHER CERTIFIES, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: August 28, 2025